# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

| | |
|---|---|
| DAVID BACA, DUSTIN MACKINTOSH, RONALD BRENT DENNY, and DAVID MCCAMISH<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF NORTHGLENN, COLORADO; JAMES MAY, JR., Northglenn Chief of Police, sued in his official capacity; HEATHER GEYER, Northglenn City Manager, sued in her official capacity; and AMANDA PETERSON, Northglenn Director of Parks, Recreation, and Culture, sued in her official capacity;<br><br>    Defendants. | Civil Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs David Baca, Dustin Mackintosh, Ronald Brent Denny, and David McCamish (collectively "Plaintiffs"), by and through counsel, bring this complaint for relief against the City of Northglenn, Northglenn Chief of Police James May, Northglenn City Manager Heather Geyer, and Northglenn Director of Parks and Recreation Amanda Peterson (collectively "Defendants").

## I.    INTRODUCTION

1.    This is a civil rights action brought under 42 U.S.C. § 1983 challenging the City of Northglenn's enactment and enforcement of City Resolution 54 ("CR-54"), which prohibits groups of five or more people from using public park pavilions and outdoor spaces on a recurring basis. CR-54 is facially unconstitutional; it is a breathtakingly broad prohibition that would make

1

criminals of families holding weekly picnics, Scout troops meeting monthly, running clubs gathering on Saturdays, book clubs convening in pavilions, or coworkers sharing lunch every Thursday. The ordinance leaves critical terms undefined, vesting unbounded discretion in enforcement officials to decide what "monopolizes" a facility, what "impedes" access, and when recurring use becomes criminal—all without any objective standards, procedural safeguards, or meaningful limitations.

2.      Plaintiffs, along with other members of their respective churches, and as a sincere expression of their religious faith and a form of protected speech and assembly, have gathered weekly at E.B. Rains Jr. Memorial Park to share meals, prayer, Bible study, and Christian fellowship with members of the Northglenn community, including members of the homeless community. These acts are religious exercises central to their faith.

3.      The events leading up to June 2025 show that CR-54 was not enacted for neutral reasons—it was enacted to specifically prohibit Plaintiffs' religious gatherings. After the City's Chief of Police announced he was "tasked with shutting down the weekly gatherings," the City enacted CR-54 in June 2025 and has enforced it exclusively against Plaintiffs' religious gatherings while permitting numerous comparable secular groups to use the park without interference.

4.      The City's actions violate the Free Exercise Clause, Free Speech Clause, and Equal Protection Clause of the First and Fourteenth Amendments to the United States Constitution, as well as parallel provisions of the Colorado Constitution. CR-54 is facially invalid as an impermissibly vague enactment and an overbroad restriction on fundamental rights. As applied, it violates the Constitution through religious targeting, viewpoint discrimination, and selective enforcement that cannot survive any level of constitutional scrutiny.

## II.    PARTIES

5.      Plaintiff David Baca is an adult resident of Colorado and a pastor at The Crossing Church located in Westminster, Colorado. Since 2020, he has participated in and helped lead weekly ministry gatherings in E.B. Rains Jr. Memorial Park ("Park") to minister and serve weekly meals to the local homeless population in accordance with his sincerely held religious beliefs. Pastor Baca's right to gather in the Park is prohibited by the City's enactment and enforcement of CR-54.

6.      Plaintiff Dustin Mackintosh is an adult resident of Colorado and the lead pastor at Next Step Christian Church located in Thornton, Colorado. Since March 2021, he has participated in and helped lead weekly ministry gatherings serving homeless individuals in the Park. Pastor Mackintosh was cited on September 18, 2025, for violating park rules following the City's enactment of CR-54.

7.      Plaintiff Ronald Brent Denny ("Brent Denny") is an active member of Brave Church at its Westminster, Colorado, campus, volunteering and meeting on a recurring basis in the Park to minister and serve weekly meals to the local homeless population in accordance with his sincerely held religious beliefs. Mr. Denny was cited on September 18, 2025, for violating park rules following the City's enactment of CR-54.

8.      Plaintiff David McCamish is an active member of Brave Church at its Westminster, Colorado, campus, volunteering and meeting on a recurring basis in the Park to minister and serve weekly meals to the local homeless population in accordance with his sincerely held religious beliefs. Mr. McCamish was cited on September 18, 2025, for violating park rules following the City's enactment of CR-54.

9.     Defendant, City of Northglenn ("City"), is a Colorado municipal corporation located in Adams County, Colorado, and organized under the laws of Colorado. The City of Northglenn, by and through its City Council, enacts all city legislation, including CR-54, and is responsible for its enforcement.

10.     Defendant James May, Jr., is the Northglenn Police Department's Chief of Police. As Chief of Police, Defendant May exercises command over all police department personnel. The Northglenn Police Department, under the command of Defendant May, is responsible for enforcing the Northglenn City Code and at all relevant times operated as a subdivision of Northglenn. This Defendant is sued in his official capacity.

11.     Defendant Heather Geyer is Northglenn's City Manager. As City Manager, Defendant Geyer is the city's chief administrative officer responsible for directing the operations of all city departments (including the police department) and enforcing all laws and ordinances passed by the Northglenn City Council. The office of the City Manager at all relevant times operated as a subdivision of Northglenn. This Defendant is sued in her official capacity.

12.     Defendant Amanda Peterson is the Northglenn Director of Parks, Recreation, and Culture. Defendant Peterson runs the Department of Parks, Recreation, and Culture and at all relevant times operated as a subdivision of Northglenn. This Defendant is sued in her official capacity.

**III.     JURISDICTION AND VENUE**

13.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, enforceable under the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*

14.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     This Court's supplemental jurisdiction over Plaintiffs' claims under the Colorado Constitution and state law is proper pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts.

16.     This Court has the authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201-2202; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

17.     Under 28 U.S.C. § 1391, venue is proper in this district because the events described herein occurred in this district and/or Defendants reside in this district.

### V.    FACTUAL BACKGROUND

18.     The Park is a 28-acre public park located in, maintained, and operated by the City of Northglenn, Colorado.

19.     The Park is a traditional public forum, open to the public.

20.     The Park's eight pavilions combined are designed for over 400 people to use simultaneously.

21.     The Park has six pavilions that can individually seat up to 50 people per pavilion, along with two larger pavilions that can individually seat up to 72 people.

22.     Prior to June 9, 2025, park pavilions were open on a first-come, first-served basis if the pavilion was not already reserved. If a pavilion was reserved, reservations were posted at the specific pavilion to put other groups on notice.

23.    In addition to the pavilions, the Park has numerous picnic tables and benches for families and members of the community to gather.

24.    Many community members and groups use the Park and its facilities for various activities and gatherings.

A.    **Plaintiffs' Use of the Park and its Facilities**

25.    Pastor Baca and Crossing Church began ministering and serving the local homeless community in or around July 2020.

26.    Over the next five years, Pastor Baca was joined at the Park by another pastor and volunteers from two other local churches, including Pastor Mackintosh from Next Step Church, along with Brent Denny and David McCamish from Brave Church, to serve and minister to the local community, including members of the local homeless population.

27.    Plaintiffs and other members and volunteers from their respective churches have regularly gathered in the Park on Tuesdays and Thursdays from 12:00 pm to 1:00 pm to share meals, prayer, Bible study, and Christian fellowship.

28.    On Tuesdays, in addition to providing meals for the local community, the gathering typically consists of a sermon followed by a prayer circle.

29.    On Thursdays, in addition to providing meals for the local community, the gathering typically consists of worship music, prayer, and a Bible study.

30.    Plaintiffs sincerely believe feeding, serving, and ministering to the local community, including the homeless community, is a religious exercise central to their faith. These activities are compelled by their religious beliefs and are expressions of their faith.

31.    Tuesday meals are typically provided by Pastor Baca's Crossing Church. Pastor Mackintosh's Next Step Church and volunteers from Brave Church rotate providing meals every other Thursday. Regardless of which group provides the meals, members from all three churches attend each Tuesday and Thursday gathering.

32.    The Tuesday gatherings typically draw around 30 to 40 people, while the Thursday gatherings draw only around 20 people—complying with the capacity restrictions for any pavilion on each day.

33.    From around July 2020 to the summer of 2024, a period of over four years, Plaintiffs and other volunteers from their respective churches conducted the weekly gatherings without incident or objection from city officials.

34.    The churches used one of the Park's many pavilions that were offered on a first-come, first-served basis, consistent with the Park's previous general policies.

35.    The previous park rules did not require permits for this type of gathering.

36.    During this four-year period, there were no documented complaints about the ministry gatherings causing disruption, monopolizing park facilities, or interfering with other park users' access.

**B.    City's Initial Opposition to Plaintiffs' Gatherings**

37.    On or around July 2024, by and through various city officials, Northglenn first indicated its opposition to the ministry gatherings.

38.    During one of Plaintiffs' July 2024 gatherings, Defendant Chief of Police James May arrived and informed those participating in the gathering that he had been tasked with shutting down Plaintiffs' weekly gatherings.

39.     Following Plaintiffs' July 2024 encounter with Defendant May, on August 26, 2024, Defendant May's assistant reached out by email on behalf of Defendant May to set up a private meeting with Plaintiff Pastor Mackintosh "as [his] church has been highlighted as an organizer for lunches being served at E.B. Rains Park."

40.     Communications between Plaintiffs and Defendant Mays's office culminated in a 1:00 pm private meeting on September 24, 2024, at the Northglenn Police Department.

41.     The September 2024 meeting was attended by Pastor Dustin Mackintosh, Pastor David Baca, Deputy Chief of Police Randall Darlin, Director of Parks Amanda Peterson, Northglenn Program Manager Jessica Hulse, and Adams County Deputy Director of Human Services Eddie Valdez.

42.     During this meeting, city officials informed the group that they could not continue meeting in the park for the weekly gatherings.

43.     The City expressed safety and security concerns, characterizing the homeless community as inherently dangerous and claiming the ministry created a "magnet" for homeless individuals.

44.     The City's characterization of homeless individuals as inherently dangerous and its assertion that serving them creates a "magnet" reveals discriminatory intent based on who the ministry serves and the religious motivation for serving them.

45.     City officials went as far as recommending another county building in a completely different city and jurisdiction. This alternative was later determined by Plaintiffs as unfeasible, as Mr. Valdez informed Plaintiffs that they could not use the county building's kitchen or even the electricity.

46.     During the September 2024 meeting, Pastors Mackintosh and Baca informed city officials that serving the local homeless population, not only through meals but also by forming human connections with individuals in the community, is central to their faith and religious convictions.

47.     During the September 2024 meeting, city officials also claimed that organized use of the park without a permit was not permissible—failing to acknowledge that a permit was never before required. Prior to the enactment of CR-54, the Park pavilions were open on a first-come, first-served basis if there were no current reservations.

48.     City officials cited safety and security concerns, characterizing the homeless community as inherently dangerous and claiming the ministry created a "magnet" for homeless individuals.

49.     City officials also claimed that homeless individuals would linger after events leaving messes, and referenced an assault involving a child by a homeless individual that Plaintiffs later determined happened on a Wednesday—a day that Plaintiffs do not even meet in the Park.

50.     The September 24, 2024, meeting exclusively involved pastors and church representatives being told their gatherings violated city policy. No other groups using the Park were called in for similar discussions.

51.     This singling out of religious actors demonstrates targeting based on religious identity and exercise.

52.     Despite the City's stated opposition, Plaintiffs and the weekly gatherings continued at the Park. Meanwhile, behind the scenes, the City was actively preparing to shut the gatherings down.

53.     On September 30, 2024, Ms. Hulse acknowledged the religious purpose of the meetings in a follow-up email to Pastor Mackintosh, stating, "I think we can all agree on the importance of the intent on the lunches to not only provide a meal, but social connections."

**C.      Northglenn's Current Park Policy**

54.     On April 28, 2025, City staff presented to the City Council proposed amendments to the Public Facilities Standards.

55.     On May 8, 2025, the Parks and Recreation Advisory Board approved CR-54, and on June 9, 2025, the Northglenn City Council adopted CR-54, titled "Public Facilities Standards" (A true and accurate copy of CR-54 is attached hereto as Exhibit A).

56.     Given Plaintiffs' private discussions with city officials, CR-54's Background section makes it abundantly clear that this policy was enacted to target Plaintiffs' use of the Park. Consistent with city officials' goal of shutting down Plaintiffs' weekly gatherings, the "proposed amendments include language that clearly defines '*organized group*,' and differentiates the use of sports fields *from other park spaces*…The proposed amendments would prohibit any group from reserving or dropping-in to utilize *a pavilion* or a park on a recurrent basis." Ex. A at p. 1 (emphasis added).

57.     CR-54 provides that group use of the pavilions, outdoor spaces, and athletic fields is generally prohibited without a permit. The issuance of a permit is at the sole discretion of city officials. Ex. A at p. 5.

58.     CR-54 further provides that "pavilions and outdoor spaces other than athletic fields may not be rented or otherwise utilized for group use on a recurrent basis." Ex. A at p. 6. Under CR-54, permit or not, recurrent use is prohibited.

59.    CR-54 defines "group use" as five or more individuals participating in such group use. *Id.*

60.    "Recurrent" means occurring on more than one occasion in a manner that monopolizes all or part of the facility and impedes open access by others. *Id.*

61.    CR-54 does not define critical terms such as "monopolizes," "impedes," or "open access," leaving enforcement decisions to the subjective discretion of police officers and city officials.

62.    The five-person threshold in CR-54 is unreasonably low for a park designed to accommodate hundreds of people simultaneously.

63.    CR-54 provides no time frame or any standards to guide city officials in deciding whether to issue a permit.

64.    CR-54 does not provide any mechanism to review the denial of any permits.

65.    Under the plain language of CR-54, the rule would criminalize a family of five or more meeting weekly for a picnic, a running club gathering every Saturday, or five coworkers sharing lunch at a pavilion every Thursday.

66.    CR-54 permits one-time events of up to 72 people, demonstrating that the ordinance's concern is not with group size or park capacity but with recurring use—specifically, the recurring religious gatherings.

67.    The stated purpose of CR-54 is to ensure open access to public facilities and prevent monopolization, but its five-person threshold and prohibition on recurring use are not narrowly tailored to achieve these objectives.

**D.      Selective Enforcement Against Plaintiffs**

68.      On August 21, 2025, Defendant Amanda Peterson, in her official capacity as Director of Parks, informed Pastor Mackintosh by email that Plaintiffs' ongoing use of the pavilions at the Park violates the amended Park rule.

69.      Pastor Mackintosh responded on August 27, 2025, informing Ms. Peterson of Plaintiffs' concerns with these new rules, including that "many are convicted [sic] that this is a violation of their right to live out their faith in the public space" and emphasizing that these weekly gatherings are not "lunch programs," but are *religious practices*.

70.      Ms. Peterson later responded on September 5, 2025, claiming that the intention behind the rules was to "simply allow the park to be open and available for use by the general public based on the nature of the park, and the desire of the City not to have this space made unavailable to such use by virtue of group use by any group as defined by the park rules." Ms. Peterson would go on to add that the City will enforce the park rules moving forward.

71.      Less than a week later, on Thursday, September 11, 2025, Northglenn police officers issued a warning to the ministry leaders under CR-54.

72.      Officers reportedly stated they "did not know how to code it" or "how to cite this thing," demonstrating the lack of clear standards in CR-54 and the officers' confusion about its application.

73.      On Thursday, September 18, 2025, Pastor Mackintosh and volunteers Brent Denny and David McCamish were cited for unlawfully violating park rules under Northglenn Municipal Code § 9-10-2 by simply being in the park.

74.    On September 18, 2025, Brent Denny was alone at a nearby pavilion working on his computer. Although he was not participating with the group in any religious activity, illegal or otherwise, officers still proceeded to cite him.

75.    When officers arrived on September 18, they asked the ministry leaders what church they were associated with and how many individuals from each church were present in the park.

76.    This explicit inquiry into religious affiliation demonstrates that enforcement decisions were tied to religious identity, not neutral application of group size restrictions.

77.    Officers requested and recorded which churches the three Plaintiffs were from, despite claiming the interaction concerned only group size.

78.    If CR-54 were truly about group size and monopolization, the religious affiliation of participants would be irrelevant.

79.    Upon information and belief, prior to being cited, officers told the men that they only wanted to give them a warning, but after speaking back and forth with command over the phone, the officers were instructed to cite the individuals from the churches.

80.    Upon information and belief, the Northglenn Seniors met at the park twice on August 26, 2025, and twice on August 28, 2025, for group fitness classes, yet were not approached.

81.    Upon information and belief, on September 1, 2025, an adult day care service was in the park at the same time as Plaintiffs' group and was not cited.

82.    On the same day Plaintiffs were cited—September 18, 2025—an adult day services group was present in the Park at the same time but was not cited.

83. Under CR-54's plain language, all Northglenn Seniors classes after their initial class would constitute as recurrent group use violating CR-54, yet on information and belief, they were not cited or approached.

84. On September 23, 2025, Ron, a member of the homeless community and frequent preacher at the ministry gatherings, also received a citation.

85. On September 23, 2025, officers made the group disperse and go home, leaving prepared food behind that was accordingly damaged or destroyed, and preventing them from completing their ministry activities that day.

86. No group other than the religious ministry is known to have received citations under CR-54.

87. The selective enforcement against the religious ministry, while numerous other groups continue to use the Park freely, demonstrates that the City's actions are directed at religious exercise itself.

88. On September 22, 2025, Plaintiff Pastor Mackintosh spoke at a City Council meeting regarding CR-54. The City Council members provided no substantive response.

89. Following the citations, city officials invited Plaintiffs to meet privately yet again to discuss Plaintiffs' continued concerns with CR-54.

90. This meeting was on October 1, 2025, attended by Pastor Mackintosh, Pastor Baca, and Brent Denny. City officials attending the meeting included Defendant City Manager Heather Geyer, Defendant Chief of Police James May, and Defendant Director of Parks Amanda Peterson.

91.    During the October 1 meeting, Brent and the pastors reiterated their concerns with CR-54. Despite the City's actions leading up to October 1, city officials still claimed that this rule was not aimed at Plaintiffs.

92.    Nonetheless, on information and belief, no other group had been called in to discuss this rule nor given a citation.

93.    On October 12, 2025, Mr. Denny notified city officials by email that CR-54 could pose significant legal risk to the City.

94.    Plaintiffs reiterated that serving homeless individuals is an act of religious expression central to their faith.

95.    On October 13, 2025, Pastor Mackintosh attended the City Council's meeting and spoke to councilmembers regarding Plaintiffs' concerns with CR-54.

96.    The City has since paused enforcement of CR-54's recurrent use provision regarding the issuance of citations.

97.    The City scheduled a special Council meeting for November 17, 2025, to discuss possible amendments to CR-54.

98.    Despite pausing enforcement, the City has refused to dismiss the three September 18, 2025, citations issued to Pastor Mackintosh, Brent Denny, and David McCamish.

99.    The City stated it would continue the cases until after the November 17, 2025, discussion.

100.    The citations against Plaintiffs remain pending and active.

101.    The City continues to "monitor and observe" Plaintiffs' recurrent use at the Park until determining its next steps.

102.    Plaintiffs remain subject to prosecution under the pending citations and are chilled from exercising their constitutional rights to religious exercise, free speech, and assembly.

103.    The citation proceedings for Pastor Mackintosh, Brent Denny, and David McCamish are stayed until December 18, 2025.

104.    The threat of prosecution, combined with the City's continued monitoring, creates an ongoing chilling effect on Plaintiffs' constitutional rights.

105.    Plaintiffs face imminent harm: they are subject to pending criminal citations, ongoing monitoring by city officials, and the threat of future enforcement if they continue their religious gatherings.

## VI.    CAUSES OF ACTION

**Count I**
**Facial Violation of Plaintiffs' First Amendment**
**Right to Freedom of Speech - Overbreadth**
**(U.S. Const. amend. I; 42 U.S.C. 1983)**

106.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

107.    Pursuant to 42 U.S.C. § 1983, Plaintiffs bring this claim against Defendants for acting under the color of state law to deprive them of their First Amendment right to free speech as guaranteed by the U.S. Constitution.

108.    The Park is a traditional public forum; as a public forum, the Park is open to everyone for general use and serves as a venue for public expression.

109.    Defendants' CR-54 is not narrowly tailored to serve a significant government interest and does not leave open ample alternative channels of communication for Plaintiffs.

110.     First, CR-54 is not narrowly tailored. The five-person threshold is dramatically under-inclusive relative to the park's capacity.

111.     The prohibition on recurrence is both over- and under-inclusive: it bans small, harmless recurring gatherings, while permitting large one-time events that create far greater temporary monopolization.

112.     CR-54's five-person threshold is extraordinarily low and bears no rational relationship to any legitimate governmental interest in a park designed to accommodate hundreds of people simultaneously.

113.     The Park has multiple large pavilions seating up to 72 people, smaller pavilions seating 40-50 people, and numerous picnic tables and benches throughout.

114.     The Park can accommodate 600 or more people at once.

115.     A group of five people cannot "monopolize" facilities designed for hundreds.

116.     By setting the threshold at five people, CR-54 criminalizes the vast majority of group activities in public parks, including activities that present no conceivable threat to park access or any other legitimate governmental interest.

117.     The threshold applies without regard to the size of the facility being used, the availability of alternative seating, the time of day, actual demand for park facilities, or any other factor related to the City's asserted interest in preventing monopolization.

118.     CR-54 prohibits use "on more than one occasion"—meaning that the second time any group of five or more people gathers at the park, they have violated the ordinance.

119.    The qualifying language—"in a manner that monopolizes all or part of the facility and impedes open access by others"—provides no meaningful limitation because these terms are undefined and inherently subjective.

120.    A family holding a weekly picnic at a 50-person pavilion has no way to know whether this "monopolizes" the facility when 40 other seats remain available.

121.    The ordinance provides no answers as to whether occupying any space or using the same pavilion twice monopolizes it.

122.    Even assuming the City has a legitimate interest in preventing actual monopolization of park facilities, the universe of conduct that CR-54 prohibits vastly exceeds any conduct the City could constitutionally regulate.

123.    The ratio of protected to unprotected speech swept up by CR-54 is overwhelming. For every gathering that might arguably monopolize facilities, hundreds or thousands of harmless gatherings are also prohibited.

124.    Defendants' enactment of this facially overbroad ordinance has caused and will continue to cause Plaintiffs and countless others irreparable injury for which there is no adequate remedy at law.

125.    Pursuant to 42 U.S.C §§ 1983 and 1988, Plaintiffs are entitled to an award of monetary damages in the amount to be determined by the evidence and this Court, injunctive and declaratory relief, and reasonable costs of this lawsuit, including reasonable attorneys' fees.

**Count II**
**Facial Violation of Plaintiffs' First Amendment**
**Right to Freedom of Speech - Vagueness**
**(U.S. Const. amend. I; 42 U.S.C. 1983)**

126.     Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

127.     Pursuant to 42 U.S.C § 1983, Plaintiffs bring this claim against Defendants for acting under the color of state law to deprive them of their First Amendment right to free speech as guaranteed by the U.S. Constitution.

128.     The First Amendment imposes heightened vagueness requirements when a statute regulates speech or expressive conduct.

129.     Vague laws offend the Constitution because they fail to give fair notice, chill protected speech through uncertainty, and vest enforcement officials with standardless discretion that invites discriminatory enforcement.

130.     CR-54 is unconstitutionally vague on its face because it employs multiple undefined terms that provide no objective standards for determining what conduct is prohibited.

131.     CR-54 prohibits recurring use "in a manner that monopolizes all or part of the facility."

132.     The ordinance does not define "monopolizes."

133.     No person of ordinary intelligence can determine what constitutes "monopolization" of "all or part of" a facility under CR-54.

134.     The term "monopolize" could mean actual exclusion of others, or it could mean simply using more than one's proportionate share, or it could mean regular use that makes others feel the space is "taken" even if physically available.

135.    Without definition, "monopolize" means whatever enforcement officials subjectively decide it means on any given day.

136.    CR-54 prohibits recurring use that "impedes open access by others."

137.    The ordinance does not define "impedes," "open access," or how much impediment triggers a violation.

138.    CR-54 prohibits use "on more than one occasion" but provides no temporal limitation.

139.    CR-54's multiple undefined terms compound one another, creating impossible uncertainty about what conduct is prohibited.

140.    A person of ordinary intelligence reading CR-54 cannot determine:

    a. How many people may gather;

    b. How often they may gather;

    c. For how long they may stay;

    d. What percentage of a facility they may use;

    e. Whether the availability of alternative seating matters;

    f. What time period is relevant for determining "recurring" use.

141.    Park users must guess at what is prohibited, and their guesses are subject to the unbounded discretion of enforcement officials.

142.    Families do not know whether their weekly picnic is criminal and may forgo it rather than risk citation.

143.    Civic groups, religious organizations, and informal associations cannot determine whether their planned activities violate CR-54 and may abandon plans to use public parks rather than risk prosecution.

144.    This deterrent effect on protected speech is precisely what the vagueness doctrine aims to prevent.

145.    CR-54's vague terms vest enforcement officials with standardless discretion to decide what conduct violates the ordinance.

146.    Officials may enforce CR-54 based on personal preferences, viewpoints, demographic characteristics of park users, or other improper considerations.

147.    Two identical gatherings may be treated differently based solely on the subjective judgments of different officers or the same officer on different days.

148.    CR-54 is unconstitutionally vague on its face because no application of the ordinance can provide the fair notice and objective standards required by the Constitution.

149.    The vagueness inheres in CR-54's text and cannot be remedied by clarifying enforcement guidelines or case-by-case adjudication.

150.    By enacting CR-54, Defendants have violated and continue to violate the Due Process Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment.

151.    Defendants' enactment of this unconstitutionally vague ordinance has caused and will continue to cause Plaintiffs and countless others irreparable injury for which there is no adequate remedy at law.

152.    Pursuant to 42 U.S.C §§ 1983 and 1988, Plaintiffs are entitled to an award of monetary damages in the amount to be determined by the evidence and this Court and reasonable costs of this lawsuit, including reasonable attorneys' fees.

### Count III
### Facial Violation of Plaintiffs' First Amendment
### Right to Freedom of Speech – Viewpoint Discrimination and Unconstitutional Prior Restraint
### (U.S. Const. amend. I; 42 U.S.C. 1983)

153.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

154.    Pursuant to 42 U.S.C § 1983, Plaintiffs bring this claim against Defendants for acting under the color of state law to deprive them of their First Amendment right to free speech as guaranteed by the U.S. Constitution.

155.    It is clearly established the government cannot justify allowing all views of an issue except those dealing with the subject matter from a religious standpoint. This reflects the basic principle that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.

156.    Defendants denied Plaintiffs' right to freedom of speech by discriminating against them based on the content of their message.

157.    Defendants denied Plaintiffs' right to freedom of speech by discriminating against them on the basis of their religious viewpoint.

158.    Viewpoint discrimination is an egregious form of content discrimination and is presumptively unconstitutional.

159.    Plaintiffs' ministry activities constitute protected speech under the First Amendment.

160.    Sharing meals with community members, engaging in prayer and Bible study, delivering sermons, and providing charitable service are all forms of expressive conduct protected by the First Amendment.

161.    These activities communicate messages of faith, charity, social inclusion, and the religious imperative "to serve the least of these."

162.    Defendants have enforced CR-54 based on the religious viewpoint and content of Plaintiffs' expressive activities.

163.    The City's opposition to Plaintiffs' gatherings is driven by the religious nature of the activities and the religious message they convey.

164.    During the September 18, 2025, citation incident, officers explicitly asked Plaintiffs, "How many people are part of your church?"

165.    This question directly inquired into the religious identity and affiliation of the group, demonstrating that enforcement was based on religious viewpoint rather than neutral park regulations.

166.    Officers requested and recorded which churches the three Plaintiffs represented, making explicit that religious identity was central to the enforcement decision.

167.    Defendants have enforced CR-54 exclusively against Plaintiffs' religious gatherings while permitting numerous comparable secular groups to use the Park without citation or interference.

168.    These groups include: Adult special needs daycare groups meeting at the same time as the ministry; groups who have rented pavilions for recurring use; Afghan refugee gatherings; walking clubs; pickleball groups; and the Northglenn Seniors, who, for example, met twice on August 26, 2025, and twice on August 28, 2025, for group fitness classes.

169.    These secular groups create similar or greater impacts on park usage, group congregation, and the City's asserted concerns about mess and security.

170.    The City's exclusive enforcement against religious gatherings while permitting comparable secular uses demonstrates that enforcement is driven by the religious viewpoint and message, not by neutral application of park regulations.

171.    If CR-54 enforcement were truly about group size and park monopolization, the religious affiliation of participants would be irrelevant.

172.    Defendants have no sufficient government interest to justify their discriminatory treatment of Plaintiffs.

173.    As applied to Plaintiffs, CR-54 operates as a prior restraint on speech in a traditional public forum.

174.    CR-54 requires groups of five or more to obtain a permit before engaging in recurring expressive activities in the Park.

175.    A licensing or permit system is a classic form of prior restraint on speech.

176.    CR-54 lacks narrow, objective, and definite standards to guide the licensing authority.

177.    The undefined terms "monopolizes," "impedes," "open access," and "facility" vest officials with unbounded discretion to grant or deny permits based on subjective judgments.

178.    Officers' statements on September 11, 2025, that they "did not know how to code it" or "how to cite this thing" demonstrate the absence of clear standards.

179.    Even assuming the City has a compelling interest in ensuring park access and preventing monopolization, enforcing CR-54 against Plaintiffs' gatherings is not narrowly tailored to achieve this interest.

180.    Less restrictive alternatives exist, including capacity-based restrictions, time limits, reservation systems, or complaint-driven enforcement.

181.    The City's four-year tolerance of Plaintiffs' gatherings demonstrates that enforcement is not necessary to achieve any compelling interest.

182.    Pursuant to 42 U.S.C §§ 1983 and 1988, Plaintiffs are entitled to an award of monetary damages in the amount to be determined by the evidence and this Court and reasonable costs of this lawsuit, including reasonable attorneys' fees.

**Count IV**
**Violation of Plaintiffs' First Amendment**
**Right to Free Exercise of Religion**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**

183.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

184.    Pursuant to 42 U.S.C. § 1983, Plaintiffs bring this claim against Defendants for acting under color of state law to deprive them of their First Amendment right to free exercise of religion as guaranteed by the U.S. Constitution.

185.    The First Amendment prohibits government action that is neither neutral nor generally applicable toward religion.

186.    Plaintiffs sincerely believe that feeding, serving, and ministering to the local community, including the homeless community, is a religious exercise central to their faith.

187.    Sharing meals, prayer, Bible study, sermons, and Christian fellowship with homeless individuals are religious practices compelled by Plaintiffs' faith.

188.    Defendants have engaged in express religious discrimination.

189.    Defendants' actions and CR-54 substantially burden Plaintiffs' sincerely held religious beliefs and expression.

190.    Defendants' actions and CR-54 are neither neutral nor generally applicable in that (1) CR-54 was passed and enforced by Defendants to regulate and/or prohibit Plaintiffs' conduct because it is undertaken for religious reasons, and (2) numerous other groups have been observed using park facilities without citation or interference.

191.    The historical background and specific sequence of events leading to CR-54's enactment demonstrate religious targeting and a law that is not neutral.

192.    In summer 2024, after four years of peaceful operation, the Chief of Police informed individuals that he had been tasked with shutting down the weekly gatherings.

193.    This statement reveals that City leadership identified Plaintiffs' gatherings as a target for suppression before CR-54 was enacted.

194.    On September 24, 2024, the City held a meeting exclusively with pastors and church representatives, telling them their gatherings violated city policy.

195.    No other groups using the Park were called in for similar discussions, demonstrating that the City singled out religious actors.

196.    During the September 18, 2025, citations, officers explicitly asked Plaintiffs, "How many people are part of your church?" and recorded which churches they represented.

197.    This inquiry into religious affiliation demonstrates that enforcement decisions were tied to religious identity, not neutral application of park regulations.

198.    If CR-54 were truly about group size and monopolization, the religious affiliation of participants would be irrelevant.

199.    In addition, CR-54 lacks general applicability both in its structure and in its application.

200.    Numerous secular groups engage in recurring use of the Park with five or more people, yet have not been cited or subjected to enforcement.

201.    Secular groups create the same alleged impacts on park usage—group congregation, potential for mess, security concerns—that the City claims justify CR-54's enforcement against Plaintiffs.

202.    Many of these groups likely exceed Plaintiffs' group size and duration of park use.

203.    These secular activities undermine the government's asserted interests.

204.    Because CR-54 is neither neutral nor generally applicable as applied to Plaintiffs, it must satisfy strict scrutiny.

205.    Under strict scrutiny, Defendants must demonstrate that enforcing CR-54 against Plaintiffs is narrowly tailored to advance a compelling governmental interest.

206.    Defendants had no sufficient government interest in burdening Plaintiffs' religious beliefs and expression.

207.    Defendants' actions and CR-54 are not narrowly tailored to advance any compelling government interest.

208.    The five-person threshold sweeps in vast amounts of ordinary family, civic, and religious activity that poses no threat to park access in a park designed for 600+ people.

209.    The prohibition on "recurrence" is overbroad, banning small, harmless recurring gatherings alongside any gatherings that might theoretically monopolize facilities.

210.    Plaintiffs' gatherings of 20-40 people in a park with multiple pavilions and capacity for hundreds cannot credibly monopolize facilities or impede access.

211.    CR-54, as applied against Plaintiffs, constitutes a violation of Plaintiffs' First Amendment right to freedom of religion as incorporated and applied to the states under the Fourteenth Amendment.

212.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to an award of monetary damages in the amount to be determined by the evidence and this Court, injunctive relief, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**Count V**
**Violation of Plaintiffs' Fourteenth Amendment**
**Right to Equal Protection**
**(U.S. Const. amend. XIV; 42 U.S.C § 1983)**

213.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

214.    The Equal Protection Clause commands that no State shall deny to any person within its jurisdiction the equal protection of the laws. Put simply, the State must treat all similarly situated persons alike.

215.    The Equal Protection Clause protects religious individuals against unequal treatment.

216.    Defendants' actions and CR-54's application violate Plaintiffs' right to Equal Protection as similarly situated groups—groups of five or more people meeting on a recurrent basis in the Park—are treated differently based on their religious identity and the demographic they serve.

217.    Plaintiffs and other recurring groups using E.B. Rains, Jr. Memorial Park are similarly situated in all material respects.

218.    All such groups consist of five or more people meeting on a recurring basis in the Park.

219.    All such groups occupy park facilities, including pavilions, picnic tables, benches, and open spaces.

220.    Despite being similarly situated, Defendants have treated Plaintiffs fundamentally differently from other park users.

221.    Plaintiffs have been:

a. Subjected to special meetings with city officials;

b. Warned by police officers;

c. Cited under CR-54 on September 18, 2025;

d. Required to disperse and prevented from completing their activities on September 23, 2025;

e. Required to leave food behind that was accordingly destroyed or lost;

f. Subjected to ongoing monitoring and observation by city officials.

222. Defendants' unequal treatment and religious animus are further demonstrated by Defendants' conduct towards Plaintiffs' leading up to the passage of CR-54.

223. Defendants had no sufficient government interest to justify the discriminatory exclusion of Plaintiffs' ministry.

224. Defendants' actions and CR-54 therefore violate the Equal Protection Clause of the Fourteenth Amendment.

225. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to an award of monetary damages in the amount to be determined by the evidence and this Court, injunctive relief, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**Count VI**
**Violation of Plaintiffs' Colorado Right to Free Speech**
**(Colo Const. art. II, sec. 10; 42 U.S.C § 1983)**

226. Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

227. The Colorado Constitution provides greater protection for free speech than the First Amendment.

228. The Park is a traditional public forum under Colorado law.

229. For the reasons stated in Counts I and II, CR-54 is facially invalid under Article II, Section 10 of the Colorado Constitution.

230. CR-54 is overbroad, prohibiting vast amounts of protected speech, assembly, and associational activity in traditional public forums.

231. The five-person threshold criminalizes ordinary family gatherings, civic associations, religious groups, and informal social groups engaging in expressive activity.

232.     The breadth of CR-54's prohibition on speech and assembly in public parks far exceeds any legitimate governmental interest in park management.

233.     CR-54 is unconstitutionally vague under Colorado law, failing to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

234.     The undefined terms "monopolizes," "impedes," "open access," and "facility" provide no objective guidance to park users or enforcement officials.

235.     This vagueness chills protected speech and authorizes arbitrary enforcement, violating fundamental principles of due process and free speech under Colorado law.

236.     CR-54 does not meet the time, place, and manner test required by Colorado law.

237.     CR-54 is not narrowly tailored to serve any significant governmental interest.

238.     The five-person threshold and prohibition on recurring use sweep far more broadly than necessary to address any legitimate concern about park access or monopolization.

239.     For the reasons stated in Count III, CR-54 as applied to Plaintiffs violates Article II, Section 10 of the Colorado Constitution.

240.     Defendants have enforced CR-54 through viewpoint discrimination, denying Plaintiffs access to a traditional public forum based on the religious content and viewpoint of their expressive activities.

241.     Officers explicitly inquired into Plaintiffs' religious affiliation, asking "How many people are part of your church?"—demonstrating that enforcement was based on religious viewpoint.

242.    The City's stated concerns about gatherings acting as a "magnet" for homeless individuals reveal disapproval of the message of social inclusion and charitable service that Plaintiffs express.

243.    Defendants have enforced CR-54 exclusively against Plaintiffs' religious gatherings while permitting numerous comparable secular groups to use the Park freely.

244.    By enacting and enforcing CR-54 against Plaintiffs, Defendants have violated and continue to violate Article II, Section 10 of the Colorado Constitution, both facially and as applied.

245.    Defendants' actions have caused and will continue to cause Plaintiffs irreparable injury for which there is no adequate remedy at law.

246.    Plaintiffs are entitled to declaratory relief that CR-54 violates Article II, Section 10, injunctive relief prohibiting its enforcement, and damages.

**Count VI**
**Violation of Plaintiffs' Colorado Right to Free Exercise**
**(Colo Const. art. II, sec. 4; 42 U.S.C § 1983)**

247.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

248.    Article II, Section 4 of the Colorado Constitution protects free exercise.

249.    Plaintiffs' ministry activities constitute sincere religious exercise protected by Article II, Section 4.

250.    Plaintiffs sincerely believe that feeding and ministering to homeless individuals is a religious exercise central to their Christian faith.

251.    CR-54 directly burdens Plaintiffs' religious exercise by criminalizing their recurring ministry gatherings.

252.    Plaintiffs cannot fulfill their religious obligation to serve the homeless community without gathering regularly to share meals, prayer, and fellowship.

253.    For the reasons stated in Count IV, CR-54, as enacted and enforced against Plaintiffs, violates the guarantee of free exercise in the Colorado Constitution.

254.    Plaintiffs are entitled to declaratory relief that CR-54 violates Article II, Section 4, injunctive relief prohibiting its enforcement, and damages.

**Count VII**
**Violation of Plaintiffs' Colorado Right to Equal Protection**
**(Colo. Const. art. II, sec. 25; 42 U.S.C. § 1983)**

255.    Plaintiffs repeat, reallege, and incorporate by reference herein all preceding paragraphs as fully set forth herein.

256.    The right to equal protection of the law is guaranteed to Colorado citizens by means of the due process clause of Article II, Section 25 of the Colorado Constitution.

257.    The Colorado Constitution protects religious individuals against unequal treatment.

258.    The State must treat all similarly situated persons alike.

259.    Defendants' actions and CR-54's application violate Plaintiffs' Colorado right to equal protection as similarly situated groups—groups of five or more people meeting on a recurrent basis in the Park—are treated differently based on their religious identity and the demographic they serve.

260.    Plaintiffs and other recurring groups using E.B. Rains, Jr. Memorial Park are similarly situated in all material respects.

261.    All such groups consist of five or more people meeting on a recurring basis in the Park.

262.    All such groups occupy park facilities, including pavilions, picnic tables, benches, and open spaces.

263.    Despite being similarly situated, Defendants have treated Plaintiffs fundamentally differently from other park users.

264.    Plaintiffs have been:

      a.    Subjected to special meetings with city officials;

      b.    Warned by police officers;

      c.    Cited under CR-54 on September 18, 2025;

      d.    Required to disperse and prevented from completing their activities on September 23, 2025;

      e.    Subjected to ongoing monitoring and observation by city officials.

265.    Defendants' unequal treatment and religious animus are further demonstrated by Defendants' conduct towards Plaintiffs' leading up to the passage of CR-54.

266.    Defendants had no sufficient government interest to justify the discriminatory exclusion of Plaintiffs.

267.    Therefore, Defendants' actions and CR-54 violate Plaintiffs' right to equal protection of the law under the Colorado Constitution.

268.    Plaintiffs are entitled to declaratory relief that Defendants' actions and CR-54 violate Article II, Section 25, injunctive relief prohibiting CR-54's enforcement, and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.      Injunctive relief enjoining Defendants and their officers, agents, employees, staff, and any other persons acting on their behalf from enforcing CR-54 and violating Plaintiffs' constitutional and statutory rights;

2.      A declaratory judgment that Defendants' actions leading up to the passage of CR-54, the policy itself, and the enforcement of CR-54 against Plaintiffs violated Plaintiffs' rights guaranteed under the Colorado Constitution and the First and Fourteenth Amendments to the U.S. Constitution;

3.      Compensatory, or in the alternative, nominal damages for the violation of Plaintiffs' rights guaranteed under the First and Fourteenth Amendments;

4.      An award of Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

5.      Any other further relief to which Plaintiffs may be entitled.

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Nathan Moelker
Nathan Moelker (VSB No. 98313)
AMERICAN CENTER FOR
LAW & JUSTICE
201 Maryland Ave. NE
Washington, D.C. 20002
Phone: (202) 546-8890
Facsimile: (202) 546-9309
Email: nmoelker@aclj.org

Geoffrey R. Surtees*
AMERICAN CENTER FOR
LAW & JUSTICE
P.O. Box 60

New Hope, KY 40052
Phone: (502) 549-7020
Email: gsurtees@aclj.org

Garrett A. Taylor*
AMERICAN CENTER FOR
LAW & JUSTICE
625 Bakers Bridge Avenue
Franklin, TN 37067
Phone: (615) 599-5572, ext. 4008
Email: gtaylor@aclj.org

*Motions for Admission forthcoming

**ATTORNEYS FOR PLAINTIFF**